CHICAGO, R. I. & P. RY. CO. v. EDDY.

(Circuit Court of Appeals, Eighth Circuit. November 17, 1915.)

No. 4436.

1. CARRIERS ⊂═⊃318—ACTIONS FOR INJURIES TO PASSENGERS—SUFFICIENCY OF EVIDENCE.

In an action for the death of a person, struck by a train while at a railroad station for the purpose of taking passage on a train, an admission in the answer that he was struck by one of defendant's trains, and a stipulation that he was carrying mileage and was a passenger, made a prima facie case for plaintiff.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. ⊂═⊃318.]

2. CARRIERS ⊂═⊃320, 347—ACTIONS FOR INJURIES TO PASSENGERS—QUESTION FOR JURY.

In an action for the death of a person, who went upon planking between east-bound and west-bound railroad tracks for the purpose of taking passage on an approaching west-bound train, though an east-bound train was approaching at the same time, evidence held to make questions

for the jury as to defendant's negligence and plaintiff's contributory negligence, and as to whether the company, in the exercise of the care required of it, could have seen him and prevented the injury, notwithstanding his negligence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1118, 1126, 1149, 1153, 1160, 1167, 1179, 1190, 1217, 1233, 1244, 1248, 1315–1325, 1346, 1350–1386, 1388–1397, 1402; Dec. Dig. ☞320, 347.]

3. COURTS ☞338—JURISDICTION—ACTIONS FOR DEATH.

Though, under a statute of Illinois, actions for death occurring outside the state of Illinois cannot be brought in the courts of that state, it was not error for the District Court for the District of Minnesota to take jurisdiction of an action for death occurring in Illinois, as it would have been contrary to the public policy of Minnesota to decline jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 901; Dec. Dig. ☞338.]

In Error to the District Court of the United States for the District of Minnesota; Wilbur F. Booth, Judge.

Action by Horace W. Eddy, as executor of Walter N. Sanborn, against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Edward S. Stringer, of St. Paul, Minn. (Edward C. Stringer and McNeil V. Seymour, both of St. Paul, Minn., on the brief), for plaintiff in error.

Humphrey Barton, of St. Paul, Minn. (John H. Kay, of St. Paul, Minn., on the brief), for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and TRIEBER, District Judge.

CARLAND, Circuit Judge. The parties to this controversy will in this opinion be designated as in the trial court. The action was instituted by the plaintiff to recover damages for the death of Walter N. Sanborn, alleged to have been caused by the negligence of the defendant. The action is based on the statute of Illinois; the injury causing death having been received at Ottawa, in said state. There was a trial, resulting in judgment for the plaintiff. The defendant brings the case here, assigning as error the refusal of the trial court to direct a verdict in its favor.

[1] It is claimed in support of the assignment of error that there was no evidence of negligence on the part of the defendant, and also that the evidence of contributory negligence on the part of Mr. Sanborn was so undisputed as to require the court to declare as matter of law that the plaintiff could not recover. At the trial it was stipulated by counsel as follows:

"It is also stipulated between counsel for the respective parties that the deceased in this case was carrying mileage good on the defendant road, and that the defendant was carrying him as a passenger on its road."

The answer of the defendant alleged as follows:

"On said 7th day of October, 1913, said Walter N. Sanborn, wrongfully, unlawfully, and negligently, at Ottawa, in said state, walked between the tracks of this defendant, well knowing the approach of one of defendant's trains, and

then and there walked upon and near the track upon which said train was approaching and was struck by said train, sustaining an injury resulting in death."

We have, then, upon the record, regardless of the testimony, the conceded fact that Sanborn was a passenger and that he was killed by one of the trains of defendant striking him. This constituted a prima facie case on the part of the plaintiff. Stokes v. Saltonstall, 13 Pet. 181, 10 L. Ed. 115; Railway Co. v. Pollard, 22 Wall. 341, 22 L. Ed. 877; Inland Coasting Co. v. Tolson, 130 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270; Gleeson v. Virginia Midland R. Co., 140 U. S. 345, 11 Sup. Ct. 859, 35 L. Ed. 458; Kirkendall v. Union Pacific, 200 Fed. 197, 118 C. C. A. 383 (8th Cir.).

[2] The evidence introduced at the trial showed without much dispute the following facts: The defendant has a station at Ottawa, Ill. In front thereof, running east and west, are two main railway tracks. The first track, nearest the station platform, carries trains going east; and the second track carries trains going west. The distance between the second rail of the first track and the first rail of the second track is 8 feet. Freight and passenger cars extend over the rails of the track about 2 feet. This would leave 4 feet in the clear between two trains standing or moving on the tracks in question. Horn, a witness for defendant, made the distance between trains 4½ feet.

Mr. Sanborn, on October 4, 1913, proceeded to defendant's station at Ottawa, Ill., for the purpose of taking passage on a passenger train going west and due to arrive at said station at 7:42 p. m. This train on the evening in question was late and did not arrive until about 8:10 p. m. Mr. Sanborn remained in the station until some one said, "It's a-coming;" then he walked out. Mr. K. S. Sampson followed Mr. Sanborn, and they both crossed the first track and stood upon the planking between the first and second track, which planking extends between the tracks and in front of the station 160 feet.

When Mr. Sanborn and his companion were crossing the first track, a freight train moving from 4 to 6 miles an hour was approaching the station at Ottawa from the west. The freight train consisted of 30 loaded cars, 4 empties, and the caboose. The conductor of the freight train looked ahead of his train, as he testified, expecting to find at the station train No. 231, which was the passenger train that Sanborn was to take. Not seeing the passenger train, the freight train passed on over the first track, and at the time the caboose of the freight train was directly in front of the station the engine attached to the train which Sanborn was to take passed the caboose going west. At this same time the conductor of the freight train also testified that he was standing on the steps of the caboose, looking to see the number of the passenger engine. As soon as he saw the number, or at the same time, he saw a man lying on the ground, and a man standing up. The man lying down was about the center of the baggage car of the passenger train. His head was toward the east.

Mr. Sampson, who was standing upon the planking with Mr. Sanborn and was to take the same train, testified as to the circumstances surrounding the accident as follows:

"Q. After going across the first track, and noticing the passenger train coming, and later the freight train, what did you do then? A. I stood right on the platform there, right in between the tracks there, on the planks between the two tracks. Q. Which engine passed you first, the engine pulling the freight train, or the engine pulling the passenger train? A. The freight train passed us quite a little while before the passenger train came up. Q. Had the passenger train engine and the passenger train passed you before the freight train got entirely past you? A. No; it had not passed us yet. There was a few coaches yet left when the passenger engine pulled up. Just how many there was I don't remember. I didn't count them, either. Q. Then the engine that was pulling the passenger train passed you before the freight train had got entirely past? A. Oh; yes, sir. Q. How close were you standing to this other man at the time the engine went by? A. I should judge about 3 or 4 feet. He was standing east of me. Q. Where were you standing with reference to the two tracks? A. We were kind of faced—I was facing; I think I was facing; it was dark; I think we were both trying to face—the passenger train. Q. Looking easterly? A. Yes, sir; looking easterly. Q. Where, with reference to the two tracks; in the middle? A. Yes. Q. Between them, or to one side or the other? A. How is that? Q. Whereabouts between the two tracks were you standing? A. About in the center, when both trains were pulling in. We stood near the center of the platform. Q. Where was this other man standing? A. Well, we both stood about the same way. He told me that we had better stand closer to the freight train. I thought he was pretty close to the passenger train at the time. That is all. That is the last he spoke to me. Q. How much room was there between the two trains as they were passing there? A. Well, I thought there was plenty of room until I got struck with something. I don't know what it was. Q. What was the first thing that you knew of anything going wrong? A. When it hit me here on the hip. I can't say what happened then; but I put up my hands this way (indicating), and then he fell, too, and he groaned. He fell down on the ground. Q. How much of the freight train had passed you before you were hit? A. Not a great deal of it. Q. Have you any idea as to how many cars there were in the freight train? A. In the rear? Q. Yes. A. I couldn't say positively about that; I think it couldn't have exceeded—I don't know how many. I was kind of excited at the time. Q. Did you move your position at all whilst standing there between the two trains? A. To the best of my recollection I didn't. Q. Did you notice the other man move at all? A. No; I didn't. Q. You were looking like towards the other man? A. Yes; I was looking kind of eastwards. I looked kind of sideways, with my grip in my hand. Q. This other man was standing east of you, I understood you to say? A. Yes; he stood on the east side of me. Q. You were hurt on your hip? A. Yes. Q. Which hip were you hurt on? A. On the right hip. Q. Were you struck any place else? A. No; not to amount to anything. One of my fingers bled a little. I expect I hit the ground with my hand as I was struck. I don't know, but I might have. I just had a scratch; I think it was on the left hand. I got twisted round some way; I don't know how. But it was nothing to speak of. Q. Did you fall down? A. Well, I couldn't say now. No; I didn't fall down. I might have fell on my knees at that time, but I didn't fall right down. I was not down. Q. The other man fell clean down? A. Yes, sir; I saw him roll right over. Q. Which track was his head nearest to after he fell down? A. My recollection is he fell towards the passenger train, and that his head leaned north. That is the best of my recollection. Q. Were your clothes injured at all? A. Yes, sir; I had my pants torn. Q. Did you bring them here with you? A. Yes. Q. Will you produce them? (A pair of trousers is now produced in court.) Q. Is this the pair of pants you had on? A. Yes, sir; that is the pair of pants I had on. Q. I believe you said they were torn. A. Yes; they were torn. I had them glued by a tailor at the Rapids, glued up. It does not show very much; it shows some. Q. Is that the place? (Indicating a place on the trousers.) A. Yes; that is the patch, that was torn out. They never was torn before, I know, except that this kind of a square patch place. Q. The square patch on the right leg of your pants is where your pants were torn at the time you were struck? A.

That had torn my trousers, so there was a hole in there. You see I was looking eastwards, and it came that way. I would hardly have expected it, but it must have given me a terrible knock, because I thought I seen stars, and I was twisted around. Q. Do you know what did hit you? A. No; I do not. Q. I take it it must have been something on the freight train that struck you? A. That is my opinion. I don't know what it was; I couldn't say."

It is clear that passengers, in order to take a passenger train going west, would be obliged to cross the first track and stand upon the planking between the tracks; at least it could not be said to be negligence on the part of the passenger in so doing, laying aside for the moment the fact that the freight train was moving upon the first track in the opposite direction. The planking was an invitation for passengers to stand there. While standing there, it is conceded that Mr. Sanborn was injured by either the freight train or the passenger train striking him. Although it is conceded that one or the other of the trains hit Mr. Sanborn, none of the employés of the defendant in charge of said trains claim to have seen Mr. Sanborn or Mr. Sampson at all. There was some testimony on the part of the railway company, given by the witnesses Brady and Rigdon, that they called out to Mr. Sanborn and his companion, when they were crossing the first track, not to go there. It does not appear, however, that Mr. Sanborn heard the warning, if it was given, and the witness Sampson testified that he did not hear any such call. But, however this may be, we are of the opinion that whether defendant was negligent, or whether Mr. Sanborn was guilty of contributory negligence, or whether, even if he was guilty of contributory negligence, the company, in the exercise of the care required of it, could not have seen him and prevented the injury, were all questions of fact under the evidence for the jury, within the ruling of the Supreme Court of United States in the case of Chunn v. Railroad Co., 207 U. S. 302, 28 Sup. Ct. 63, 52 L. Ed. 219; and the cases therein cited.

[3] It is claimed that the court below should not have taken jurisdiction of this action, because a statute of Illinois provides that no cause of action for death occurring outside the state of Illinois can be brought in the courts of Illinois, and therefore it is argued that the courts of Minnesota should not take jurisdiction in cases where the injury was received in Illinois. There is nothing in this point. The public policy of Minnesota is against it. Herrich v. Railway Co., 31 Minn. 11, 16 N. W. 413, 47 Am. Rep. 771; Negaubauer v. Railway Co., 92 Minn. 184, 99 N. W. 620, 104 Am. St. Rep. 674, 2 Ann. Cas. 150; Powell v. Railway Co., 102 Minn. 448, 113 N. W. 1017.

The judgment below should be affirmed; and it is so ordered.